George **BENNETT**, an Individual d/b/a
George Bennett Construction
Company

v.

The **UNITED STATES**.

No. 155–58.

United States Court of Claims.

Jan. 20, 1967.

Pierre J. LaForce, Washington, D. C., for plaintiff; John J. Ross, Washington, D. C., attorney of record, Arthur J. Phelan and Hogan & Hartson, Washington, D. C., of counsel.

John R. Franklin, Washington, D. C., with whom was Acting Asst. Atty. Gen., J. William Doolittle, for defendant.

Before COWEN, Chief Judge, and LARAMORE, DURFEE, DAVIS and COLLINS, Judges.

## OPINION

COLLINS, Judge.

On June 15, 1951, plaintiff, an individual doing business as George Bennett Construction Company, was awarded a contract calling for the construction of a levee and appurtenances on the Missouri River, near Kansas City, Missouri. At issue here is a matter of contract interpretation, the specific question being whether plaintiff's view of the plans and specifications—restricting the amount of necessary excavation to an area short of that which defendant seeks to include —was a reasonable construction of the contract. Under protest and upon the Government's insistence, plaintiff removed 105,870 cubic yards of earth— borrow material—from the disputed area; additional compensation for this extra work is the basis of the present suit.

In the prosecution of this claim, originally heard and denied by the Corps of

Engineers Claims and Appeals Board (hereinafter the "Board"), both parties, without formal objection, have proceeded to litigate the issues in a de novo proceeding, each introducing evidence in this court not previously presented before the Board. Our trial commissioner, Franklin M. Stone, has submitted detailed findings of fact recommending that judgment be granted to plaintiff. On the basis of those findings, evaluated in light of applicable legal propositions, we conclude that plaintiff is entitled to recover.

■ When reduced to its essentials, the controversy between the parties involves a very narrow matter, i. e., whether the contract specifications, read in conjunction with its detailed drawings, could be interpreted by a reasonable contractor as not requiring the removal of borrow material from that portion of the riverbank situated on a line parallel to, and approximately 260 feet distant from and beyond, the levee's centerline. To prevail on this issue, it is not essential that plaintiff demonstrate his position to be the only justifiable or reasonable one. A specification susceptible to more than one interpretation, each interpretation found to be consistent with the contract's language and the parties' objectively ascertainable intentions, becomes convincing proof of an ambiguity; the burden of that ambiguity falls solely upon the party who drew the specification. Peter Kiewit Sons' Co. v. United States, 109 Ct.Cl. 390 (1947). Reading the contract as a whole, one can be left with little doubt as to the reasonableness of plaintiff's interpretation.

As defendant points out in its brief, a drawing can set forth the lateral limits of contemplated excavation and grading in two ways. One method would involve establishing a fixed distance from a base line as the work limit—the base line in this case being the levee's centerline; another approach would define the extent of excavation by reference to elevation, i. e., by fixing the lowest elevation of a slope (here the base of the levee) with that elevation to be maintained laterally until it intersects (as it would here) with a natural boundary, i. e., the river.

In this case, the drawings did set out a fixed distance (i. e., 260 feet from the centerline of the levee), but it is defendant's contention that this was not intended to fix the lateral limits of excavation. Rather, defendant claims that the 260-foot mark simply indicated the low point of the levee slope and that the elevation at that point (722 feet above sea level) was to be maintained and carried forward to the waterline—thereby encompassing the area here in dispute.

To refute this, plaintiff points out the following: (1) the disputed area was actually in the bed of the river and subparagraph 2.06(a) (2) of the contract permitted, *but did not require*, the contractor to excavate this area if additional fill was found to be necessary; (2) the typical cross section of the area (designated on the drawings between stations 210+40 and 242+80) indicated finished slopes and elevations by heavy lines, and such lines did not show any finished slope or elevation beyond an approximate distance of 258 feet from the levee centerline; and (3) a detailed cross sectional view of the area shows a vertical line marking the 260-foot point from the levee's centerline—this vertical line on the drawing being indicated as the riverward limit of borrow excavation.

■ While plaintiff enumerates additional factors reinforcing the reasonableness of his interpretation, we find them unnecessary to sustain the legitimacy of his position. The short of the matter is that, while the Government may well have intended the contractor to continue the excavation shoreward into the disputed area, it chose a most inarticulate way of describing that objective. By fixing the riverward limit of borrow excavation at the 260-foot mark, defendant fixed the limits of the excavation that it could legally insist upon. Though the drawings could perhaps have been read another way, a reasonable construction would not have suggested it. We find that plaintiff is en-

titled to recover for the additional work that he was required to perform.

In his report to the court, the commissioner recommended that plaintiff be granted $42,383.45 as total compensation for the additional work.[1] Plaintiff contests the adequacy of this figure and seeks instead to recover a sum in excess of $100,000. The difference between what was recommended and what is sought rests in part upon plaintiff's disagreement with the hourly rental rates that should be applied in determining the contractor's ownership costs in the equipment which he used in performing the disputed excavation. The commissioner's figures were based upon the application of AGC rates;[2] plaintiff contends for the application of "force-account rates"[3] or AGC rates modified so as to reflect the greater wear and tear to which the equipment was subjected because of adverse weather conditions.

■ Though presented in a different factual context, a somewhat similar problem was discussed in L. L. Hall Constr. Co. v. United States, 177 Ct.Cl. —— (Dec.1966). In that case—which examines the question of ownership rates versus rental rates in computing delay damages—we took the position that, absent actual cost data clearly showing the specific expenses attributable to defendant's wrongful delay, a

fair and reasonable approximation could be achieved through use of AGC rates applied to the acquisition cost of each piece of equipment. In our judgment, this case (which like Hall, supra, requires speculation regarding the correct measure of damages because of the absence of actual cost figures) offers no substantial reason justifying a departure from the application of average AGC rates.

Plaintiff's reference to the aforementioned "force-account rates" is no different, in principle, from the AED rental rates rejected in Hall, supra.[4] Plaintiff was not in the business of distributing or leasing its equipment to others; thus, whatever rates might obtain under those circumstances would bear no meaningful relation to the present situation. Here the relevant inquiry is concerned solely with the determination of expenses incurred in connection with contractor-owned and contractor-operated equipment. The measure of plaintiff's recovery is to be geared to his investment cost, i. e., the actual cost of the equipment used—reference to rental rates being neither justifiable nor meaningful under such circumstances.

■ Nor would use of the force-account rates (which in actuality were rental rates) recommend itself here simply as a general proposition. The force-

1. The commissioner found plaintiff entitled to total damages of $88,966.25. The indicated figure of $42,383.45 represents the balance due after deduction of $46,582.80 —this latter amount representing a prior payment at the contract price for the disputed additional excavation.

2. Equipment ownership rates published by the Associated General Contractors of America, Inc. The reference here is to the Contractor's Equipment Ownership Expense Manual (4th ed. 1956). This manual contains a compilation of data showing the average costs to contractors of owning and maintaining construction equipment. The manual provides an "expense per working month percent" for each piece of standard construction equipment.

3. This refers to special emergency rates established by the Corps of Engineers

in May 1952 specifically for flood contract work in the nearby Fairfax, Kansas, area. The rates were based upon the hourly rental of the equipment for the 11-day flood period.

4. In Hall, plaintiff advocated the use of rates based upon the rental value of its equipment, computed in accordance with rates set forth in the Associated Equipment Distributors Manual (referred to generally as AED rates). The opinion makes note of the fact that the AED rates were designed for use by those whose business consists of equipment leasing and distribution. It also points out that annual rental rates greatly exceed actual acquisition costs and when applied to equipment which has been depreciated in whole or in part would distort the damages which might conceivably have been sustained.

account rates were intended to accommodate an emergency flood situation and were designed to obtain the immediate use of necessary equipment for a short term. Certainly the additional work involved in plaintiff's claim here was not performed under circumstances of such pressing urgency as would justify our applying a damage standard which, in large measure, ignores actual investment costs. Plaintiff's additional work was performed over a 41-day period, made difficult because of adverse weather conditions, but in no sense an emergency. An argument for the use of "force-account rates" in computing equipment expense must be rejected.

■ Similarly, we do not consider plaintiff's bid for the use of above-average AGC rates as a point well taken. While it is quite true that plaintiff's equipment was subjected to greater abuse because of the adverse circumstances under which it was used, this in itself does not warrant the use of cost rates more liberal than the average AGC rate.[5]

As the commissioner's findings show, an accurate computation of plaintiff's actual additional costs is not possible in this case, because the relevant accounting records were destroyed. Thus the amount of damages claimed must, of necessity, remain speculative in nature. But within the limits of this we can see no reason for finding that the commissioner's recommendations on damages were not fair to plaintiff.

■ In challenging the sufficiency of the recommended judgment, plaintiff ignores several important considerations. Thus, he overlooks the fact that the equipment expenses allowed here were based upon the cost of *new* equipment rather than plaintiff's own investment costs. Also overlooked is the fact that all the equipment for which allowance was made was not actually in use during the entire 41-day period. This being the case, plaintiff's contention respecting the omission of an allowance for standby time becomes meaningless. Having been paid a rate based upon the active use of all equipment for the full period involved, it necessarily follows that no additional compensation can be granted for standby time.

Our findings also show that the wage claim allowed plaintiff was based upon 6 hours of regular work and 4 hours of overtime. Though plaintiff disputes this and claims the allowance was for 8 hours at regular time and 2 hours at an overtime rate, the relevant exhibits show this not to be so. The compensation for labor costs was, like the equipment-expense allowance, liberally construed in plaintiff's favor.

As to the remaining disputed damage issues, i. e., the question of an allowance for overhead and an allowance for profit, here we feel that plaintiff is entitled to additional consideration.

■ While the commissioner did consider and make allowance for the usual "field or job overhead expenses,"[6] provision should also have been made for "home office" overhead. See Luria Bros. & Co. v. United States, 369 F.2d 701, 177 Ct.Cl. —— (Dec.1966). Since the absence of any records precludes an accurate determination for this item of expense, we feel that an additional 5 percent allowance is warranted—this to be

---

5. Average AGC rates are by no means stringent or unrealistic. Annual equipment expense, which these rates seek to define, encompasses depreciation, major repairs and overhauling, interest on the investment, storage, incidentals and equipment overhead, and insurance and taxes. In certain situations, actual costs may in fact be *less than* those allowed under AGC rates. See *Hall Constr. Co.*, supra; Perini Corp. v. United States, Ct.Cl. No. 228-58 (Commissioner Gamer's report, Nov. 30, 1965, footnote 11).

6. The commissioner allowed plaintiff $12,-033.50 for fuel, oil, and grease—this amount having been agreed upon by the parties. Labor overhead, i. e., taxes and insurance, was computed at $1,871.72, and an additional $1,918.45 was allowed as a 5 percent general overhead cost (exclusive of equipment).

computed against plaintiff's total costs of $88,966.25.[7]

As to the question of plaintiff's entitlement to a profit on the additional work he performed, this court has asserted, in a number of decisions, that a profit may not be allowed in "breach of contract" actions. J. D. Hedin Constr. Co. v. United States, 171 Ct.Cl. 70, 347 F.2d 235 (1965); Laburnum Constr. Corp. v. United States, 325 F.2d 451, 163 Ct.Cl. 339 (1963); Oliver-Finnie Co. v. United States, 279 F.2d 498, 150 Ct. Cl. 189 (1960). Both the commissioner and defendant relied upon those authorities in denying plaintiff's entitlement to a profit in this case. We decide otherwise.

▌ The term "breach of contract" as used in the cited authorities refers to a breach which is not actionable under the disputes clause. As to whether a prohibition against profit on such claims is warranted is a matter that need not be reexamined at this juncture. For here, the claim sued on is one which arises under the contract, i. e., it was amenable to administrative relief through the vehicle of a "constructive change"; hence the matter of damages should be treated in the same manner. Had plaintiff's entitlement to an equitable adjustment been established at the administrative level (that is, without the need for recourse to this court), a profit on the additional work would have been allowed. See Paccon, Inc., 65–2 B.C.A. ¶ 5227 (ASBCA No. 7890, 1965). No sound reason has been advanced to justify the application of a lesser standard of damages here.

▌ Of course, there may be situations where the claim sued on, though "arising under the contract," would nevertheless not entitle the contractor to a profit allowance. But where, as here, the Government exacts a measure of performance which the contract (pursuant to a reasonable interpretation) did not call for, then the additional work entitles the contractor to additional profit. The key is always to put the contractor in as good a position as he would have been but for the defendant's wrongful action. In this case, that point cannot be achieved if the profit to be allowed is to be limited to the contract price alone. Accordingly, it is our judgment that the allowance of a 6 percent profit on the additional work will provide plaintiff with a reasonably just return.

There remains to be considered defendant's contention respecting the inappropriateness of the de novo proceeding held in this court. Its argument in this connection is that the decision in United States v. Carlo Bianchi & Co., 373 U.S. 709, 83 S.Ct. 1409, 10 L.Ed.2d 652 (1963), requires us to limit our review to the administrative record—this despite the fact that no objection to de novo proceedings was taken until *after* the close of proof.

▌ The rationale of *Bianchi* and its progeny, United States v. Utah Constr. & Mining Co., 384 U.S. 394, 86 S.Ct. 1545, 16 L.Ed.2d 642 (1966), and United States v. Anthony Grace & Sons, Inc., 384 U.S. 424, 86 S.Ct. 1539, 16 L.Ed.2d 662 (1966), shows quite clearly that where a claim is one which is susceptible to administrative relief (i. e., where relief can be had through one or more of the standard "adjustment" clauses), then factual determinations relative to such claim are within the scope of the "disputes" clause and therefore within the province of the administrative fact finder. On appeal to this court, the legal sufficiency of administratively ascertained facts is to be judged in light of the Wunderlich Act, 68 Stat. 81, 41 U.S.C. §§ 321, 322 (1964), and not in terms of any new evidence. But that limitation does not obtain when, as here, *both parties* have proceeded to introduce new evidence to which the Government makes no objec-

---

7. Plaintiff's direct costs, as found by the commissioner, amount to $88,966.25. See finding 51. Based upon our allowance of 5 percent for home office overhead, plaintiff is entitled to an additional $4,448.31, thereby making his total cost $93,414.56.

tion until the trial proceedings have ended. Where such is the case, it is proper to regard the introduction of new evidence as a waiver of the right to insist upon strict adherence to the normal disputes procedure. The Government's (or the plaintiff's) right to a judicial review limited to the administrative record is a procedural right—it is not jurisdictional—and it may therefore be waived. Stein Bros. Mfg. Co. v. United States, 337 F.2d 861, 162 Ct.Cl. 802 (1963). See also National Presto Indus., Inc. v. United States, 338 F.2d 99, 103, 167 Ct.Cl. 749, 755, footnote 2 (1964), cert. denied, 380 U.S. 962, 85 S.Ct. 1105, 14 L.Ed.2d 153 (1965). Considerations essentially identical to those raised here were presented in WRB Corp. v. United States, 177 Ct.Cl. — (Dec.1966). We held there that the Government's full and active participation in de novo proceedings before this court, undertaken without objection until *after* the close of proof, constituted a waiver of its contractual right to insist upon an initial administrative evaluation. This case stands on the same footing; we therefore reject defendant's contention that the de novo proceedings were, in this situation, contrary to the teachings of the trilogy.

To summarize, we hold that plaintiff's construction of the contract specifications was reasonable; the additional work which he was required to perform entitles him to damage figures as determined by our commissioner, subject to the indicated modifications for home office overhead and profit allowance. Further we hold, for the reasons indicated, that defendant's belatedly asserted challenge to the propriety of de novo proceedings is to be rejected on the ground of waiver.

Plaintiff is entitled to recover the sum of $52,436.63, and judgment is entered for that amount.[8]

---

8. This amount is based upon the following:

| | |
|---|---:|
| Total cost as found by our commissioner | $88,966.25 |
| Plus: 5 percent added for "home office" overhead | 4,448.31 |
| Subtotal | 93,414.56 |
| Plus: 6 percent profit allowance | 5,604.87 |
| Total | 99,019.43 |
| Less: Amount paid at contract price | 46,582.80 |
| Balance due | 52,436.63 |