PER Curiam :
This case was referred to Trial Commissioner Lloyd Fletcher with directions to make findings of fact and recommendation for conclusions of law under the order of reference and Buie 57 (a). The commissioner has done so in an opinion and report filed on September 4, 1968. Exceptions to the commissioner’s opinion, findings and recommended conclusion of law were taken by both parties and the case has been submitted to the court on oral argument of counsel and the briefs of the parties. Since the court agrees with the commissioner’s opinion, findings, and recommended conclusion of law, as hereinafter set forth, it hereby adopts the same as the basis for its judgment in this case. Therefore, judgment is entered for plaintiff in the sum of $117,600.06.
*832 OPINION OP COMMISSIONER
Fletcher, Commissioner: Tbe plaintiff, John McShain, Inc., seeks to recover damages in its own behalf and in behalf of several of its subcontractors for an alleged breach of warranty by defendant in connection with a construction contract for an extension of the State Department Building entered into between the plaintiff and defendant, acting through the General Services Administration (GSA). The damages claimed by plaintiff arise solely out of alleged Government-caused delays.[1] The dispute was the subject of administrative proceedings before the GSA Board of Contract Appeals for an equitable adjustment under the contract. However, the Board properly denied plaintiff’s appeal for relief on the ground that it lacked jurisdiction over the subject matter. See, United States v. Utah Construction & Mining Co., 384 U.S. 394, at 412 (1966). In view of the Board’s action, and by mutual consent of the parties, a trial was held here to determine fully all questions of liability and damages. See, Stein Bros. Mfg. Co. v. United States, 162 Ct. Cl. 802, 337 F. 2d 861 (1963), partially overruled on other grounds in United States v. Anthony Grace & Sons, Inc., 384 U.S. 424, ftn. 5 (1966); George Bennett v. United States, 178 Ct. Cl. 61, 371 F. 2d 859 (1967). In light of the detailed findings of fact below, it has been concluded that plaintiff is entitled to recover for a breach of warranty by defendant and, further, that plaintiff’s damages should be computed on the basis of three months’ delay for a total amount of $69,195.28.[2] In addition, since defendant has not shown that plaintiff bears no liability to its subcontractors for an equivalent delay suffered by them, plaintiff is *833 entitled to recover the further sum of $48,404.78.[3] Blount Bros. Constr. Co. v. United States, 171 Ct. Cl. 478, 483, 346, F. 2d 962, 965 (1965) and Morrison-Knudsen Company, Inc. v. United States, 184 Ct. Cl. 661, 703, 397 F. 2d 826, 852 (1968). Cf. Severin v. United States, 99 Ct. Cl. 435 (1943), cert. denied, 322 U.S. 733 (1944).
It is a well established rule of law that when the Government issues detailed drawings and specifications for a contractor to follow, there is an implied warranty that .conformance with such drawings and specifications will result in satisfactory completion of the work. See, for example, United States v. Spearin, 248 U.S. 132 (1918), and Hol-Gar Mfg. Co. v. United States, 175 Ct. Cl. 518, 360 F. 2d 634 (1966). Although Government-furnished plans need not be perfect, they must ibe adequate for the task or “reasonably accurate.” Standard Steel Car Co. v. United States, 67 Ct. Cl. 445, 472 (1929). Here, the defendant, in its haste to meet ia fiscal year deadline, failed to have the drawings prepared with ordinary care, and they were issued before necessary checking was accomplished. Such “failure to be reasonably careful in the preparation of the plans” is basis for a breach claim. Jefferson Construction Company v. United States 183 a. Cl. 720, 729-30, 392 F. 2d 1006, 1012 (1968). The evidence clearly demonstrates that the drawings and addenda originally provided by the defendant were not sufficiently legible or coordinated to permit satisfactory construction ¡of the desired building. Thus, defendant is liable for breach of warranty in the furnishing to plaintiff of defective drawings. Laburnum Construction Corp. v. United States, 163 Ct. Cl. 339, 325 F. 2d 451 (1963).
The .defendant has taken a two-pronged and somewhat inconsistent position. First, it says that the drawings were so obviously deficient that plaintiff should have recognized the defects and anticipated resulting delay. Almost in the same breath, however, it contends that the drawings were in fact adequate and sufficient for plaintiff as ¡an experienced contractor ,to have constructed the building as planned.
*834 Defendant’s first position, of course, is intended to charge plaintiff with actual or constructive knowledge of defeats in the original ¡plans so as ,to ¡preclude plaintiff from relying upon defendant’s implied warranty that the drawings were adequate. See, for example, Wunderlich Contracting Co. v. United States, 173 Ct. Cl. 180, 351 F. 2d 956 (1965), and cases cited therein.
However, the true condition of the drawings was unknown to the plaintiff at the time it bid the project. Seemingly, even the defendant was unaware of the full extent of the inadequacies and lack of coordination in the drawings, particularly after the addenda were issued. There was no reason for the plaintiff to suspect that legible drawings could not be easily secured to replace those which were unreadable, or that the addenda drawings did not correct most, if not all, of the coordination errors apparent in the original drawings. Further, plaintiff was under no contractual or legal obligation to inspect the drawings to determine their adequacy for construction purposes prior to the contract award. Father, its study of the contract documents was merely for purposes of estimating its bid, and it has not been shown that plaintiff knew or should have known how defective the drawings actually were. Therefore, plaintiff’s pre-bid examination of the drawings did not render the implied warranty inoperative through waiver or estoppel, and plaintiff may invoke such warranty as a basis for recovery. Thompson Ramo Wooldridge, Inc. v. United States, 175 Ct. Cl. 527, 541, 361 F. 2d 222, 231 (1966).
The effect of defendant’s second position is to deny that any breach of warranty occurred. On the facts of this case, however, this contention must be rejected because there is substantial evidence to support the contrary finding that the original drawings and addenda were in fact defective and inadequate.
The inadequacy of the drawings resulted in OS A’s decision to issue a new set of corrective and clarification drawings, known as “A-drawings,” and to change the design of reinforcing steel for the building’s columns. This involved substantial delay during the early part of the contract period, i.e., August 1, 1957, when plaintiff had planned to proceed, *835 through February 1, 1958, when the A-drawings relevant to the wort at hand had been finally prepared and issued, and the larger reinforcing steel bars had been delivered. During this period, plaintiff was not significantly delayed by any other related or concurrent delay for which the defendant would not be liable, and therefore it may recover damages for idleness and other consequences of its delay. Cf. Wunderlich Contracting Co. v. United States, supra, where, despite many errors in the Government’s specifications, the Korean War contributed heavily to the difficulties encountered with the result that the contractor was unable to prove that its delays were directly caused by the Government. Cf., also, Vogt Bros. Mfg. Co. v. United States, 160 Ct. Cl. 687 (1963), with United States v. Rice, 317 U.S. 61 (1942).
After February, 1,1958, there were additional delays, some of which plaintiff alleges were due to deficiencies in the drawings, some of which were shown to have been the contractor’s responsibility, and some of which were not unusual for a project of this size and complexity and for which neither party would be responsible. However, the major source of delay after February 1 was the large number of change orders (nearly 700) issued by defendant with respect to which plaintiff admittedly has received equitable price adjustments and extensions of time. It is entitled to nothing more for these delays. United States v. Rice, 317 U.S. 61 (1942). Plaintiff has not satisfactorily proven that any delay after February 1, even if assumed to 'be partially attributable to inadequate drawings, was not in fact “concurrent or intertwined with other delays” for which the defendant is admittedly not liable, and recovery in this respect is, therefore, precluded. Commerce International Company, Inc. v. United States, 167 Ct. Cl. 529, 543, 338 F. 2d 81, 90 (1964); Wunderlich Contracting Co. v. United States, supra, at 193.
Because of the many delays flowing from the numerous change orders for which plaintiff has already been compensated, it would be improper to adopt plaintiff’s contention that the contract period as a whole must be used in computing the delay involved. While it is admittedly difficult to calculate with precision the amount of delay actually suffered by plaintiff during the early period which was directly *836 caused by defendant and for which plaintiff is entitled to recover, mathematical exactness is not required. It is sufficient if plaintiff furnishes the court a reasonable basis for 'a computation although the result may be only an approximation. F. H. McCraw & Co. v. United States, 131 Ct. Cl. 501, 510, 130 F. Supp. 394, 399 (1955). Under the circumstances of this case, it has been concluded that the most satisfactory method of determining the compensable delay period is by a comparison between the amount of work plaintiff reasonably could have completed during the six-month delay period (August 1957 through January 1958) and the amount of work it actually accomplished during that period. The evidence of record supports a finding that plaintiff actually performed approximately one-half of the work it could reasonably have done but for the delay. Therefore, it is concluded that plaintiff should recover on the basis of a three-month delay period both for itself and in behalf of its subcontractors who have made claims against plaintiff and who were delayed an equal amount of time in starting their work.
FINDINGS or Fact

The Contract: Bidding and Award

1. Plaintiff, John McShain, Inc. (a Delaware corporation) , entered into a contract with the United States, acting through the General Services Administration (GSA), for the extension and remodeling of the Department of State Building in Washington, D.C. The defendant accepted plaintiff’s bid in the amount of $35,424,200, and the construction contract, No. GS-00-B-2767, was awarded to plaintiff on June 28,1957. By the terms of the award, plaintiff was to begin work “as soon as practicable after the date of receipt of notice to proceed,” and complete the job within one thousand days thereafter.
2. Prior to the contract award, in January 1956, the defendant had employed the architectural firms of Graham, Anderson, Probst and White, Inc., and Harley, Ellington and Day, Inc., to design the building. Although the general design of the building was approved by March 1956, certain related matters remained under consideration, particularly *837 tlie location, of organizational units for which the State Department desired interior office design flexibility. In November 1956, the architects proposed furnishing the complete, working drawings and specifications by June 1,1957. However, this date was unacceptable to GSA as being too late because the State Department was committed to an award of the construction contract in fiscal year 1957. April 1, 1957, was agreed upon as a compromise date, and that date was later extended to May 1, 1957. The architects’ view of this schedule was that “a set of contract documents, suitable for bidding purposes, but not having the benefit of the check and coordination normal in our offices” could be delivered by May 1.
3. The original tracings of the final working drawings were submitted by the architects to GSA on April 30, 1957. The specifications had already been transmitted. GSA accepted the drawings and specifications in an unchecked condition with the intention to check them during the bid period and issue appropriate addenda to the invitation for bids.
4. In connection with other work to be performed on the building site, two contracts other than the one in question had been let prior to the advertisement of the subject contract. Plaintiff had been awarded a contract on September 10, 1956, for the demolition of existing structures on the site, excavation of part of the site, and the installation of foundation caissons for the first rune rows of columns along 23d Street. This work involved about 30 percent of the site and was completed in the spring of 1957. The second contract, awarded to another contractor, involved the demolition of eight-story apartment houses occupying about 20 to 30 percent of the site. Completion time for this work was scheduled in early September 1957.
5. The contract in controversy was advertised for bids on May 7, 1957, with a projected bid opening date of June 18. During the course of the bid period, five addenda were issued to change and correct work described in the original bid documents. The addenda were issued May 28, June 7,11,13, and 17,1957. Of these, the second addendum was the most extensive, consisting of a book of specifications, drawings, and lists of drawing changes which almost equaled in detail the *838 original specifications for tbe contract. A group mentary blueprints was also issued. A large number of the original drawings, somewhere between 50 to 75 percent, were modified by this addendum, and a list was compiled to indicate such changes as were made. In view of these changes, the bid opening date was extended to June 27,1957, in order to provide more time for prospective bidders to correlate the addenda, estimate, and assemble their bids.
6. During the bidding stage, plaintiff was aware of the possibility that difficulties might arise because it considered the quality of the drawings to be poor. However, it is not unusual for such documents furnished for bidding purposes to contain errors and, in most instances, experienced contractors are not unduly alarmed by apparent errors or by the issuance of addenda intended to correct the original drawings. The primary purpose of studying drawings at the bidding stage is to estimate costs, and not to determine the feasibility of construction. The latter is customarily presumed by prospective bidders from the fact that the construction contract is offered for bid in reliance upon the competence of the architects who prepared the plans and drawings. Thus, while plaintiff anticipated some problems (discussed below), because its examination of the contract documents during the bidding period did not involve detailed scrutiny from a construction point of view, plaintiff did not recognize the extent of the errors in the drawings on which it bid, nor did it communicate its rather vague apprehensions to the defendant.[1]

Inadequacy of Contract Documents

7. However, following plaintiff’s award, it developed that the contract documents were faulty in two respects: (a) certain portions of prints of the drawings were so blurred as to be illegible; and (b) the drawings were not properly coordinated with one another, even after the issuance of the addenda during the bid period. The illegible prints resulted from the manner in which they had been prepared. Prints of the initial drawings issued to bidders were made from the *839 architects’ original tracings of pencil on linen. However, in preparing the addenda drawings, the 'architects, rather than anaking their corrections on the original tracings, had made corrections on a set of paper reproductions which, in turn, had been made from another set of reproductions of the original linens. The resultant prints were in part smudged and difficult to read. Although the illegible portion of the drawings was small in relation to the entire set of drawings, the pneumatic tube drawings (the 9-23 series), and the mechanical drawings involving plumbing, heating, ventilating, and air conditioning (the 33-M series) were the most difficult to read. The illegibility of some of the addenda drawings, the mechanical portion of the work in particular, was noticed by the interested subcontractors. However, the problem was not considered by them as ¡serious because they felt it could be remedied by merely requesting legible copies of ike drawings at the outset of construction.
8. While it may not have been impossible to work with the illegible drawings, proper construction procedures would have required a tedious and difficult process of constant referral to the original drawings, addenda drawings, and the list of changes in the addenda specifications in order to piece together the necessary information. Notwithstanding such a possibility (.which may not have been ¡considered at the time), Standard Engineering Company, the plumbing, heating, and piping subcontractor, informed the plaintiff by letter dated July 18, 1957, of its need for readable drawings and listed certain of them as “impossible to read.” At a meeting on July 18, plaintiff requested that such readable mechanical drawings be furnished, 'and Government representatives undertook to supply them within 10 days. This request was repeated in writing on July 25 by plaintiff’s letter addressed to the Commissioner of Public Buildings Service of GSA. Meanwhile, notice to proceed had been given July 17, 1957, and was received by the plaintiff on July 22. The plaintiff proposed to start work “within ten days,” or about August 1,1957.
9. Although fully legible prints of the mechanical drawings were not yet available, plaintiff and its subcontractors nonetheless attempted to plan the work of the various trades *840 involved. In the process, more ings than had ’been given during the bidding stage revealed that the drawings also were not fully coordinated so that plaintiff and its subcontractors could not continue to plan and proceed with the work as had been anticipated by them.

The A-Drcmings

10. During the mornilng of August 15,1957, a meeting was held in the office of the construction engineer which was attended by representatives of the plaintiff, the plaintiff’s subcontractors, the defendant, and the architects. At this meeting, plaintiff’s representative, Mr. J. P. Hauck, stated that the drawings and specifications were so inadequate and incomplete that construction work beyond excavation would be impossible. The specific errors, according to a GSA memorandum prepared at the time, were then listed by the various subcontractors involved. These included, according to the memorandum, “omissions, lack of coordination, faded and illegible drawings, inability to understand addenda, unavailability of equipment * * * discrepancies between drawings and specifications, etc.” Also, at this meeting, Hauck made a request for “new drawings,” which defendant urges was tantamount to a request that the Government undertake to combine the original bid drawings with the addenda drawings merely for the convenience of the contractor. However, the evidence adduced at trial shows that this request for “new drawings” actually was a reiteration of plaintiff’s earlier request for clarification and readable drawings which would, as stated in a letter from the Commissioner of Public Buildings Service to the architects, “clearly show their intent and with construction details coordinated with existing work and pertinent job conditions.” The record justifies the conclusion that plaintiff did not ask for a new set of drawings simply for the purpose of easing its own j ob and increasing its work efficiency ; nor was defendant’s decision to order new drawings (hereinafter referred to as the “A-drawings”) based upon any such understanding of plaintiff’s request.
11. Another meeting was held in the afternoon of August 15 in the office of the Deputy Commissioner of the Public Buildings Service, Mr. Fred S. Poorman. At this meeting, *841 there was a conversation between Poorman and Hauck from which, again, plaintiff and defendant draw differing inferences. In response to Poorman’s suggestion that the contractor proceed to construct the building in accordance with the contract documents upon which it bid and received its award of the contract, Hauck replied that, while this was possible, in his opinion the Government would be dissatisfied with the resulting structure. The defendant infers from this conversation, among other things, that (a) the building could have been constructed without the issuance of the A-drawings, and (b) the A-drawings were issued at the insistence of and merely for the convenience of the contractor. The record does not justify these inferences. While a structure of doubtful suitability could have been built from the contract documents, this does not mean that the issuance of the A-drawings (or, at least, compliance with the more limited request for readable and coordinated drawings) was unnecessary or superfluous. Further, the conversation does not support an inference that plaintiff demanded a set of “new drawings” merely for its convenience. Eather, it appears from these discussions that, at the time, neither party fully realized the extent of the clarifications, corrections, changes, etc., involved in the issuance of the A-drawings.
12. At the afternoon meeting of August 15, the new set of A-drawings was proposed as the best solution to the then known problems and in mutual recognition of the difficulties which would probably arise in attempting to construct the desired building from the contract documents. This procedure was believed by the contractor and the Government to be in the best interests of all concerned. The A-drawings were to include “clarification, correction of errors, coordinating the different branches of work, drawings changes incorporated in the addenda to the specification, and other obvious and mandatory changes to be incorporated in the contract under change orders.”
13. The defendant directed the architects to prepare the set of drawings, known as “A-drawings”, essentially to clarify the contract documents which included the original drawings, addenda drawings, and related materials on which the contractor had bid. The Government expected that the *842 A-drawings would be delivery to be made as drawings for specific phases are completed. The order of phases shall follow construction sequence as far as possible.” As stated above, the extent of the corrections, changes, and consequent delays which resulted from use of the A-drawings was not fully realized at this time. The decision to issue the new set of drawings was that of the Government in recognition of the deficiencies in the original drawings.
14. The contractor neither requested nor desired that changes from the contract documents be incorporated into the A-drawings. However, numerous changes were in fact made by those drawings, and these changes were later treated as change orders for which plaintiff has been paid. They are not in dispute here.
15. The A-drawiings constituted between 500 and 600 new drawings which were furnished to plaintiff over a period of six months, 'beginning in September 1957, and ending near the end of February 1958. Each party contends that the other was responsible for this unexpected delay. A fair evaluation of the evidence, however, indicates that neither the contractor, the architects, nor the Government representatives were dilatory or uncooperative in the matter. Rather, it appears that the scope of the task required much more time than the thirty days initially estimated by the Government, and this would have been true even if there had not been any changes incorporated into the A-drawings.

Construction Problems Encountered

16. The record supports the ultimate finding that the original contract documents were not fully coordinated, and were unreadable in significant parts, 'and that this fact necessitated the issuance of the corrective A-drawings. From the complaints of the contractor and subcontractors, the discussions and correspondence between the contractor, GSA and architects, it is clear that the decision to issue the A-drawings reflected GSA’s concern over the poor condition of the contract documents. The A-drawings were substituted for nearly all of the original and addenda drawings, and still further *843 changes or modifications were made, as evidenced by fly sheets which supplemented the A-drawings.[2]
17. Other than the original defective drawings, the most significant delay problem (which arose shortly after the decision to issue the A-drawings) centered around the reinforcing steel bars designed as welded clusters within the columns (known as core ’bars) which were intended to interlock with •the reinforcing steel bars within the caissons (known as dowels) upon which the columns rest. This problem is described in detail in the 'findings immediately following.
18. In an effort to obtain the maximum usable space, the columns were designed to be as small as possible for a building of this size. In turn, this marginal design required that tolerances for fitting the column bars adjacent to the dowel bars be extremely close, i.e., of a magnitude approximating one inch. The original design may have been feasible, even though difficult to execute in the field. However, the record also shows that changes which were made to the original design of the superstructure affected the feasibility of constructing the columns in the intended manner, particularly since some of the caissons had already been constructed by McShain under its earlier contract.[3] The total effect was to make the design almost impossible of execution without some change. Therefore, at the time of the construction in question, what may or may not have been coordinated and feasible according to the original documents, no longer remained so. It is noteworthy that, in addition to other supporting testimony, there is a notation in the architect’s log “that insuff. time was given for coord, and that existing dowels interfere because orig. plan, loads, etc. were revised.”
19. The column core bars (welded clusters of four to eight bars, called “bundled bars”) were intended to interlock with the innermost ring of dowels extending upwards from the caissons. However, it developed that the core bars would not fit properly into the caissons as planned. Some dowels extend *844 ing from the caissons had shifted, unusual and could be reasonably expected. The defendant maintains that the core bars could have been made to fit, under a different construction practice than that of plaintiff, by placing them individually within the dowels. Under this theory of defendant, the plaintiff should not have welded the core bars together prior to placement thereof within the ring of dowels which had been done with the intention of setting in the core bars as a “caged” unit. But for this procedure, says defendant, the individual bars could have been set and welded in place. It cannot be concluded from the evidence however, that plaintiff’s construction technique was improper, or that it precluded the design from being successful. To the contrary, the weight of the evidence shows that the core bars could not be coordinated with the projecting dowels because of the inflexibility of the bars themselves. In an attempt to test the practicability of the original design, the Chief of the Structural Division of the Public Buildings Service made plywood templates of the locations of bars, and concluded therefrom that the bars would not fit. At the time the problem arose, the record shows that no one really believed the design could be made to work in the field, or that the columns could be constructed in accordance with the drawings, even though theoretically they may have appeared to be sound.
20. In addition, plaintiff asserts that the columns could not have been constructed using the reinforcing steel design shown in the drawings because of an alleged requirement for steel plates upon which the core bars were intended to rest for the purpose of transferring weight from the core bam to the caissons. The defendant denies the existence of any requirement for such steel plates and, in its behalf, structural engineers testified at the trial in this court that the original drawings did not show a requirement for steel plates and that construction was possible without them. On the other hand, at the earlier GSA Board hearing, there was testimony on both sides concerning the actual use of steel plates for the core bars. The record is not clear as to why some witnesses remembered efforts to use such plates, while the drawings do not depict them. However, the record supports a finding that there was an attempt made to use steel plates and that this *845 was at least a contributing factor to the difficulties encountered in effecting a proper placement of the columns on the caissons. There is no convincing showing that plaintiff simply added steel plates on its own initiative. Under all the circumstances, it is fair to conclude that the use of steel plates was contemplated by representatives of both sides at the site, and that this was an additional factor in the final decision to change the reinforcing steel design.
21. The defendant presented testimony that the original design could have been retained with the use of bundled bars if the contractor had simply burned off the nonaligned bars and replaced them. This may be a common corrective practice where reinforcing bars are not aligned, but whether it would have been a feasible solution to the problem encountered here, or even whether such a solution was considered, is not clear.[4] The fact remains that the Government did not adopt this method as a solution to the problem. It is clear that a considerable amount of attention was paid to the problem, and it was finally decided by the Government not to use the bundled bars design. It appears that the change to larger bars was first suggested by plaintiff’s steel detailer, and that plaintiff brought this to the Government’s attention. However, the record does not support defendant’s inference from this fact that the plaintiff requested the change for its own convenience. Instead, the evidence shows that all plaintiff wanted was a feasible means of construction and that it supported the recommended decision to change to larger steel bars.
22. The record as a whole supports the finding that the columns could not feasibly be constructed from the drawings, and offers little support for the position that some other construction change could have satisfactorily corrected the situation. At the time the problem arose, there was no contention by Government representatives that the plaintiff’s construction techniques were improper, that plaintiff was either inept or unreasonable in concluding that the design could not be followed, or that the reinforcing design was adequate or could have been made adequate through other corrective *846 means. In this connection, Government decided to change the design to larger reinforcing bars, it did so by Change Order No. 223 which appears in the Change Order List under: “Change Orders Involving Corrections of Defects- and Omissions in the Design.” Therefore, the defendant’s present position is not supported by the record and seems to be based largely on hindsight. The fact is that the change, which affected all caissons not then constructed and all columns, was occasioned by the inadequacy or infeasibility of the method of construction originally specified.
23. The change referred to above substituted the use of larger bars, known as “18-S” bars, for the bundled No. 11 bars. One side result of this change was beneficial to the plaintiff in that it limited plaintiff’s need to employ welders. At the time, there was a scarcity of competent welders and, in addition to correcting the design, this change assisted the plaintiff by reducing its need for these craftsmen. However, the record does not support the defendant’s inference therefrom that this motivated plaintiff’s support for the change.
24. The 18-S bars were not stocked items and had to be specially ordered. Delay was therefore involved in ordering and acquiring this material. At a meeting of the parties on September 25, 1957, it was informally agreed that the larger bars should be substituted. Plaintiff was requested to submit a letter reviewing the problem “and calling attention to the fact that the reinforcing in certain columns as designed was not possible to construct * * * and their [McShain’s] suggestion as to how this might be accomplished.” Plaintiff prepared and forwarded such a letter to defendant requesting the design change, noting the need for new structural drawings, and urging expeditious handling of the matter. A formal request for a change order was made and approved on October 23, 1957. Drawings covering the change were prepared and delivered to plaintiff approximately one week thereafter. This change, which involved only the columns for caissons constructed under plaintiff’s earlier foundation contract, was later expanded to include the entire project on No- *847 yember 12, 1957.[5] The 18-S bars were received by tbe plaintiff on January 28,1958, approximately 90 days after tbe final decision was made to use them.
25. Not all of tbe problems arising during construction related to tbe defendant’s failure at tbe outset to furnish legible and coordinated drawings, a failure wbicb, to a great extent, was remedied 'by tbe issuance of the A-drawings covering substantially all of tbe original and addenda drawings. Many construction problems of a type wbicb ordinarily could be expected to arise on a project of this size and complexity were corrected or resolved through tbe standard change order procedure under tbe contract. While the new A-drawings in general were adequate for the job, some problems of coordination and drawing inadequacies survived even tbe clarifications and corrections provided by tbe A-drawings. Plaintiff makes no claim for tbe extra work involved with respect to these problems since it has admittedly been paid for all changes including time extensions and payment for tbe extra expense involved. Plaintiff’s claim in this connection arises solely out of alleged delay caused by these problems. However, plaintiff has failed to prove any overall contract delay either with respect to any specific additional problem or with respect to tbe problems as a whole wbicb followed tbe receipt of the A-drawings in February 1958. Furthermore, the minor disruptions caused by these additional problems are so intertwined and concurrent with tbe delays caused by change orders, or other factors for which defendant is not liable, that plaintiff is precluded from recovery thereon. These problems, all of which followed receipt of the A-drawings, are as follows:
(a). Auditorium: The auditorium walls, which were designed to zigzag, did not coordinate with all of the supporting columns or have alternate means of reinforcement, such as beams beneath them. Also, there were two overhangs (known as wing slabs) which were designed without adequate support. Following discussion between the contractor and the Government, it was agreed that this problem should be solved by building a wall beneath *848 the slab. Plaintiff this respect for which it has not already been compensated under a change order.
(b). Ceiling Space: Plaintiff claims that the uncoordinated drawings were responsible for insufficient space in many areas between the floors and the ceilings beneath them to permit necessary mechanical and electrical installations with the result that the ceilings in those instances had to be lowered three inches. The defendant responds that the contractor selected installation parts which were too large irrespective of the fact that they conformed with permitted tolerances under the contract. Admittedly, plaintiff ordered component parts which were within the allowed tolerances and which, therefore; should have been suitable. Accordingly, the specifications seem defective in this respect, but plaintiff has failed to show any overall contract delay because of this fact.
(c). Electric transformers: The specified electric transformers were too large to be moved into and out of the building, should such movement have become necessary in the future. Therefore, the design was changed in order to permit such movement. The difficulty was corrected by a change order for which plaintiff has been fully compensated, and no contract delay specifically attributable to this change has been shown.
(d). Stone facings: Plaintiff was required to remove stone facings in the courtyards of the building because the supported stone had slipped. The defendant says that this movement was due to the contractor’s improper installation of the shelf angles supporting the stone, and there is some evidence that this was true. Plaintiff’s contrary allegation that the design was unsatisfactory has not been proved despite some doubts expressed by one of the architects. However, since at the outset plaintiff had received permission to deviate from the original design by increasing the tolerance for the recesses, it cannot be concluded that the original design for the stone facing was defective because it was never followed Although the original shelf angles were later replaced with heavier angles which held the stone satisfactorily, the evidence shows that this item must be considered as a change under the contract unrelated to plaintiff’s breach claim.
(e). Windows: Defendant contends that the plaintiff caused substantial delays in connection with the obtaining of windows for the building. After approval of the shop drawings for the window, the first two samples *849 submitted by plaintiff on July 23 and October 21, 1958, were rejected. Defendant asserts that the window was capable of manufacture, and that plaintiff was responsible for the delay involved in obtaining approval of the window which was eventually given after a change order. From the evidence it appears that plaintiff was slow in obtaining approval of the window (which could have been manufactured as designed) and, also, in the installation of the window frames. In this same connection, defendant has alleged that plaintiff caused delay in submitting for approval glazing compounds which did not meet specifications. However, plaintiff finally received approval of the same compound which nine months earlier had been rejected. Such concomitant delays by each party were not caused by inadequate drawings or defective specifications, and represent problems which are not unusual for large construction projects.
(f). Miscellaneous: The record contains testimony to the effect that certain pipes were drawn to run through the lobbies, but the evidence does not disclose how this was changed, if at all. In any event, it does not appear to have been a material factor in delaying the construction of the building. Similarly, such errors in the drawings as those which showed a vent from the kitchen extending through the skylight of the Secretary’s office, and a pneumatic tube station in a five-foot corridor blocking the use of a door, are not design defects which would make construction of the building impossible, nor was it shown that they caused any overall contract delay. They were merely errors which were corrected through the ordinary changes procedures of the contract.

Construction Progress

26. The worksite had been divided into quadrants, and plaintiff had intended to begin construction in quadrants I and II. Prior to the issuance of the A-drawings, plaintiff had received drawings for the excavation and placement of underground utilities in quadrants I and II. One of plaintiff’s subcontractors, Standard Engineering Company (Standard), prepared drawings for underground drainage in these two quadrants, which drawings differed from the contract documents. These drawings were forwarded to plaintiff on August 7, 1957. It appears that the reason for Standard’s revisions was that the contract drawings showed some inter *850 ference between the underground pipes to be laid, existing footings and caissons, and rock. Near the end of August, or the first part of September, trench work for the sewers in quadrants I and II was begun in accordance with Standard’s revisions. Also, about the same time, shop drawings for the underground utilities were approved by defendant.
27. The first group of A-drawings, issued on September 10, 1957, dealt with the structural detail for the basement, first and second floor slabs in quadrants I and II, and some wall areas. The architects tried to issue the A-drawings in (a .sequence which would reflect typical construction progress. Plaintiff appears to have ignored a request 'that it .advise the .architects .as to its priority needs in this respect, and defendant says .that plaintiff’s failure to respond shows an uncooperative attitude on its part. However, ¡at this early stage, plaintiff would only have been able to advise, in general terms, what portion of the construction work it intended to proceed with, and the sequence would have been in the same order, generally, .as was followed by the architects in issuing the A-drawings. In addition, plaintiff consistently took the position 'that it needed .all drawings which were related to one ¡another, such as for the mechanical work, coordination of mechanical work with structural work, and other similar installations. Plaintiff was not unreasonable in taking the position that these portions of the work could not even be planned, much less performed, without full knowledge of related plans and data. Until this lawsuit there does not [appear to have .been any claim by the Government .that plaintiff was not proceeding as best it could with what drawings it had.
28. Plaintiff’s shop drawings for the basement of quadrants I and II were [approved on September 26 and October 17, 1957. In November, the first floor slab shop drawings were also 'approved. However, irrespective of ,any delay in the issuance of the A-drawings, work above the basement slab, such as construction of columns to the first floor, could not proceed until the 18-S ¡bars for reinforcement were delivered. During this early period, plaintiff .and its subcontractors did as much work as was possible, and there is no showing by the defendant that they were dilatory. To the contrary, de *851 fendant ¡argues that there ,was a substantial amount of work accomplished during this time, and it is established that the plaintiff was able to ¡proceed ¡with some ¡portion of the work during the fall and early winter of 1957-8. However, as shown below, except for the change in reinforcing steel and the delay incident to the preparation of the A-drawings, plaintiff could have accomplished approximately twice as much work as it did.
29. Plaintiff and some of its subcontractors prepared working shop drawings. Some of these were rejected or approval withheld, apparently because not all of the A-drawings had been completed. Progress on the job was slowed further due to the extensive changes being made or under consideration. In this regard, it is clear that although the A-drawings originally proposed only to clarify and correct errors, their purpose was later expanded to include making extensive changes. Essentially, there was a complete review of the contract documents during which time many changes were incorporated into the project. In view of this, and the fact that it was important for the contractor to have related drawings available before it could utilize fully other drawings which may have been issued, a considerable amount of work was delayed during this period. Although, as previously mentioned, the defendant has suggested that the plaintiff did not require all the A-drawings before work could have progressed, it is more reasonable to accept plaintiff’s position that certain work could not be done without reference to related drawings. Thus, to the extent that the A-drawings were issued in a series which related to or depended upon another series yet to be issued, additional delay resulted.
Had the plaintiff not been so determined to proceed in an orderly fashion, it is possible that coordination problems would eventually have become more difficult and complicated, and even more changes made necessary. Such a possibility was undoubtedly recognized by the defendant. For example, defendant argues that the plaintiff could and should have proceeded with the installation of the electrical lines, even though at that time the precise location of all of the partitions was unknown, because if later changes were necessary, according to defendant, the plaintiff would be paid for rip *852 ping out what had been already installed. Obviously, for plaintiff to have proceeded in such fashion without the related drawings would be contrary to sound and economical construction practices, and there is no evidence that plaintiff was ever requested by GSA to proceed with such disregard for orderly procedures. Hence the defendant’s underlying position that, during the period in question, plaintiff should have accomplished more work than it did even without a complete set of drawings is not supported by the record.
30. The effect of the piecemeal issuance of the A-drawings was to upset the normal progress of construction by altering the sequence of work and delaying other work where additional drawings were known to be required. For example, plaintiff had intended to construct the first floor slab before completing the basement work, in order that construction might proceed simultaneously upwards and below. Although there was some testimony that existing muddy conditions would have precluded such procedures, the absence of a complete set of drawings certainly prevented it, and except for the early delays, there may not have been any interference from mud. Another illustration of plaintiff’s difficulties arises from its showing that because of the inadequate drawings it was placed in a position of shifting its work from quadrant to quadrant, meanwhile leaving idle the work performed during the interim period. Under all the circumstances here, the facts show that plaintiff, without any fault of its own, was forced into a position of following inefficient procedures which delayed construction.
31. The last portion of the A-drawings was finally issued to plaintiff on February 25, 1958. However, they had been substantially completed by the beginning of 1958. With respect to the delay incident to the change in reinforcing steel, delivery of the 18-S bars on January 28, 1958, enabled the plaintiff to greatly accelerate its construction pace. From this it appears that the concurrent delays due to the A-drawings and reinforcing steel change ended at about the same time, that is, in late January 1958.
Plaintiff had originally planned to proceed in early August 1957. While there is generally a slow start-up period on large *853 construction projects, plaintiff was mobilized at the worksite for some time before a substantial part of the work could be undertaken. When the A-drawings were fully completed and issued, and after the steel bars were delivered, there ensued an almost immediate increase in work accomplished. At that point in time, with the exception of delays which occurred during the construction period partly attributable to the A-drawings themselves (see finding 25), the period of substantial delay ended. The measure of the delay, therefore, is the difference between the amount of work plaintiff would have accomplished by February 1958, and the amount of work actually accomplished by that time.
32. As previously noted, the contract was to be completed within 1,000 days from receipt of notice to proceed, which, would have been in April 1960. As it finally developed, however, substantial completion of the building was not achieved until December 15, 1960, or 242 days beyond the specified time.[6]
The plaintiff had prepared a progress chart in September 1957, which indicated its intention to complete the building-in December 1959. Plaintiff urges that this chart be used as a basis for determining the extent of the delay period. In support of this contention are two basic facts: (a) the general reputation of plaintiff in the construction industry as a speedy and efficient organization; and (b) the normal delay incident to mobilization had been somewhat reduced because plaintiff had already performed excavation and foundation work involving about 30 percent of the site under its earlier contract. On the other hand, it may be fairly inferred that in computing the one-thousand day schedule set forth in the contract, the work accomplished previously under the foundation contract was taken into account. Also, at the time plaintiff prepared its progress chart, the problem of uncoordinated drawings had emerged, and plaintiff had become aware that numerous changes were probable. Despite this knowledge, plaintiff’s progress schedule proposed an earlier completion date than that required by the contract. This was entirely unrealistic, and therefore plaintiff’s progress chart of Sep *854 tember 1957 is not acceptable as a measure of the delay caused by defendant.
33. In view of the large number of changes made during the course of construction, the entire delay period of 242 days cannot be attributed to the defendant’s breach of contract. During the period from August 1958 through about June 1959, there were many delays affecting various aspects of the work. These were largely due to changes involving stop orders and consequent disruption of orderly progress for which plaintiff has already received all available relief. The substantial period of delay for which defendant is liable occurred during the fall and winter months of 1957-1958 while the A-drawings were being prepared and the delivery of the new reinforcing steel was being awaited. No convincing proof was adduced to show overall contract delays for which the defendant conceivably could be liable, and which occurred after February 1,1958 (see finding 25). Disruptions following this date appear to have been concurrent and intertwined with the delays caused by change orders or other factors for which the defendant is not liable. The evidence of record fails to establish any length of time that plaintiff may have been delayed on account of coordination problems which may have continued after the issuance of the A-drawings, nor does it satisfactorily segregate concurrent delays attributable to causes for which plaintiff has already been compensated, or for which defendant is not liable in any event. Accordingly, it must be found that the predominant causes of delay and disruption after January 1958 were essentially the many changes, rather than any coordination problems.
34. During the early period of construction, plaintiff was concerned with 'the preparation of shop drawings and coordination of the various trades, an effort which wias impeded by the piecemeal issuance of the A-drawings in series. In addition, plaintiff performed some work in the field consisting of excavation and other work related to the foundation :and placement of underground utilities. As previously noted, plaintiff had to revise its original plans to work in quadrants I and II by transferring its efforts into the other quadrants while further work in the former quadrants was delayed. In this regard, the defendant says that *855 there were other muses for delay, independent of the delay incident to preparing the A-drawings, namely, the presence of rock, the required demolition of apartment buildings located in quadrant III, and the maintenance of a road for mail trucks through quadrant III for servicing the existing .State Department Building. However, it does not appear that these factors contributed to the delay in any measure-able way. They presented no significant problems, and appear to have been overcome in routine fashion without disruption of work or delay. Concerning the rock, the testimony of the Government construction engineer in charge of the project contradicted the defendant’s present position. He said that while there was some rock, most of it had been removed during the work on the original contract, and what remained caused no delay in the subject contract. Also, the drainage system was redesigned to avoid any rock problem. He .also testified that demolition work did not delay the job to any significant degree. Thus, the defendant’s position is unsupported Iby the record, and it cannot foe found that any of these matters significantly delayed construction progress.
35. The record does not show with certainty the amount of work actually performed 'by the contractor during the delay period or iits relative value in time for the purpose of determining the precise period of delay. Several schedules and charts were used iby the parties in an attempt to estimate the delay.[7] Estimates based upon the dollar value of work completed are not helpful because the many change orders (many of which were issued on ¡a “price-tn-foe-determined-later” basis) render such estimates particularly unreliable. However, there is sufficient data and testimony from which to estimate with reasonable accuracy that by February 1, 1958, plaintiff had completed approximately 50 percent of the total work it could have accomplished but for the delay period.
38. The exhibit which best illustrates the effect of the delay period is defendant’s Exhibit No. 131, consisting of three projected progress curves comparing (a) plaintiff’s “normal” progress, based upon schedules which it submitted; (b) plaintiff’s actual performance; and (c) “normal” progress *856 for contractors as determined by a GSA Manual (hereinafter referred to as the “GSA curve”) as adjusted for this project. None of these graph curves is without some distortion. The one based upon plaintiff’s schedules is distorted by plaintiff’s unrealistic estimates as discussed previously in finding 82. Also, that “curve” does not reflect the fluctuations typical of large construction projects, but moves in a consistently straight fine for most of the period covered.[8] On the other hand, the curve based upon the GSA Manual, although adjusted for other factors, does not take into account plaintiff’s ■reputation as an especially speedy builder. Failure to do so is no doubt justified by the amount of speculation inherent in an estimate of relative efficiency between contractors. Plaintiff might well have proceeded at a somewhat faster rate of progress than the GSA curve reflects, but its progress would have been at a considerably slower rate than that reflected by the curve based upon plaintiff’s own estimated schedules. Between the two projections, the GSA curve has been selected as the more accurate measure of the delay period.
37. As shown by the aforesaid exhibit, at February 1,1958, plaintiff had completed approximately 5.5 percent of the work, as compared with the following approximated projections: (a) 11.75 percent based upon the GSA curve; and (b) 17 percent based upon plaintiff’s progress schedules. These figures show that plaintiff actually completed 46 percent and 32 percent of the two projected work schedules, respectively. In tabular form, the data is as follows:

Read in another way, the exhibit indicates that the amount of work completed by February 1 would have been accomplished approximately 64 days earlier (using the GSA curve), or 122 days earlier (using plaintiff’s progress sched- *857 tiles). However, the latter means of comparison is not as reliable as the above percentage measurement of delay (which is based upon the relationship between work completed and work projected) because of the distortion created by the relatively small amount of work accomplished in the very early period of typical construction, later followed by a sharp increase in the daily amount of completed work. This tendency is demonstrated by sharp upturns on typical projection graphs which show a steadily increasing rate of accomplishment as the construction project progresses. With this factor in mind, it is considered that the more accurate measure of delay is the difference between the amount of actual work accomplished on any given date, and what should have been accomplished by that date. From the foregoing statistical analysis and from all other credible evidence in the record, the ultimate conclusion is justified that plaintiff completed nearly one-half of the work it could have done during the six-month period of delay (August through January). Accordingly, defendant’s liability for delays must be restricted to a period of three months.
FINDINGS OF FACT RELATING TO DAMAGES
38. Damages to Plaintiff.
(a). Material Cost Increases: Plaintiff claims $21,460.81 as >a result of a steel price increase of $5 per ton effective August 1, 1958. This involved steel purchases from Sweets Steel Company from August 11, 1958, through February 4, 1959 (approximately six months) which plaintiff maintains could have been ordered prior to August 1,1958, but for the delay alleged herein. Defendant has verified this price increase. Plaintiff’s additional expense on the basis that, but for the delay, it could have purchased this steel three months earlier was $10,730.41,[9] prior to reduction for changes paid for at current rates. After subtracting the 15.15 percent stip *858 ulated rate for changes ($1,625.66) plaintiff’s material cost was $9,104.75.[10]
(b). Labor dost Increases: Plaintiff’s labor increases based on the premise they would have been incurred eight months earlier are as follows:
Laborers-$51, 587.56
Cement Finishers- 5, 080.40
Bricklayers _ 7, 620. 60
Carpenters_ 29, 870. 35
94,158.91
After applying 15.15 percent for changes agreed upon and paid at current wage rates, this increase amounts to $79,-893.84.[11] On the basis of a three-month delay, as found applicable herein, this would be $29,960.19, which figure is three-eighths of $79,893.84.
The parties agree that payroll insurance and taxes should be included at a rate of 10.2 percent of the payroll which is $3,055.94 for a three-month delay.
(c). Equipment Expense: Plaintiff claims three cranes were idle at the jobsite about six months during the first eight months of the contract because of the inadequate drawings. All three cranes involved were contractor-owned. The parties, while disagreeing upon the amount to be allowed as equipment expense, do agree upon the use of the Association of General Contractor (AGO) ownership rates for the three cranes claimed to be idle. The amounts involved are as follows for the full six-month period claimed and have been adjusted by one-half for idle status:
*859 60-ton crane. $8,586.00
25-ton crane 4,071. 90
24-ton crane 3, 909. 73
Total_ 16,567. 63
On. the basis of a tbree-montb delay, this would amount to $8,283.82 for all three cranes, which figure is three-sixths of $16,567.63.[12]
(d). Job and Home Overhead: The evidence of record fails to ¡provide all the necessary information for a proper job overhead computation during a delay period such as has been found herein. For the ¡purpose of calculating job overhead, therefore, it would appear fair and reasonable to use actual job overhead during the period of claimed delay, i.s., the first eight months (even though some work was accomplished during this period), and .then allocate to the claim that portion of delay found applicable herein. The 15.15 percent reduction ;for change orders is also applicable lacking-evidence that changes did not occur during this period since plaintiff was paid in full, including overhead, for all changes. Thus, it may properly be inferred that overhead during this period was recouped in part by change orders. Job overhead during the first eight months of the contract was $47,254.60. On the basis of a delay of three months, the amount applicable thereto would be $17,720.47, being three-eighths of $47,254.60. The total applicable to the claim herein would be $15,035.82 after reduction of the $17,720.47 by 15.15 percent for changes.[13]
*860 The (parties have agreed that head on ¡additional direct costs and on subcontractors’ increased ¡costs should be computed .at a rate of 8.8 percent of such costs, as .shown in the summary below.
(e). ¿Summary of plaintiff's claim: In summary, plaintiff’s additional expenses as computed herein, based on a three-nronth delay, are as follows:
Material cost increases-$9,104.75
Labor cost increases_ 29, 960.19
Payroll tax @ 10.2%- 3,055. 94
Equipment expense- 8,283.82
Total direct cost- 50,404.70
Job overhead- 15,035.82
Home office overhead @ 3.8% of ¡direct costs- 1,915.38
Home office overhead @ 3.8% of subcontractor increased costs _ 1,839.38
Total additional cost to plaintiff- 69,195. 28
DAMAGES TO THE SUBCONTRACTORS
39. Inasmuch as the overall contract was delayed three months, all subcontractors, both those who were at the site from the outset of the job, and those who came on the site later, were also delayed three months in starting their work. There has been no satisfactory showing 'by any of these subcontractors that they were delayed longer than three months for causes attributable to defendant’s fault. Any additional delays appear to be inextricably intertwined with change orders for which they have been fully compensated. Therefore, for the purpose of computing their damages, all subcontractors will be considered to have suffered a delay of three months only.
40. Alexander-Ernst: Harry Alexander, Inc. and E. C. Ernst, Inc. (Alexander-Ernst) formed ¡a joint venture for the electrical construction work on this contract. It submitted a bid in the amount of $4,850,000 to plaintiff just prior to bid opening on June 27,1957, and the joint venture was verbally awarded the electrical subcontract. An Alexander-Ernst superintendent was assigned to the jobsite on August 4, 1957, and joint venture offices were immediately set up on the *861 premises. The formal joint venture agreement was not signed until February 4,1958.
(a). Labor: The basis for Alexander-Ernst’s claim of additional costs for labor is the fact that on July 1 of each year its electricians received wage increases, and thus any extension of the anticipated contract period would increase plaintiff’s labor costs accordingly. Alexander-Ernst’s actual labor cost was $1,090,851.84. Its projected labor cost based on a set-back of labor for eight months would be $1,054,744.80.[14] Thus, on the basis of an eight-month delay as claimed, Alexander-Ernst’s additional labor cost was $36,107.04, prior to reduction for change orders. Since changes, which were paid at the current rates, amounted to 33.785 percent of direct labor on this subcontract, an amount of $12,198.76 (33.78'5 percent of $36,-107.04) should be deducted, leaving a total of $23,908.28 as *862 additional direct labor costs for the full eight leged delay. Based on a three-month delay, this would amount to approximately $8,965.61 for additional direct labor, a figure which is three-eighths of $23,908.28.
(b). Supervision: The parties agree that supervision cost amounted to 14.07 percent of direct labor which amounts to $1,261.46 for the three-month delay.
(c). Payroll Insurance: Payroll insurance amounted to 2.45 percent of the total of direct labor and supervision costs which amounts to $250.56 for the three-month delay period, being 2.45 percent of $10,227.07.
(d). Payroll Taxes: The parties agree that Alexander-Ernst’s social security and unemployment taxes amounted to four percent of its direct labor and supervision costs. This amounts to $409.08, being four percent of $10,227.07.
(e). National Electrical Benefit Fund: Defendant’s audit verified that Alexander-Emst contributed one percent of its direct labor and supervision costs to the National Electrical Benefit Fund. This amounts to $102.27.
(f). Field Overhead Expense: Alexander-Ernst claimed field overhead expenses for a seven-month period which included janitorial expense of $1,613.60, telephone expense of $444.44, and other field office personnel expense of $17,397. These expenses total $19,455.04. Since Alexander-Emst has recouped a portion of overhead from change orders, overhead for the purposes of this claim must ¡be reduced by that factor of recouped overhead which is agreed to be 33.785 percent. Applying this to total overhead of $19,455.04, leaves a remainder of $12,882.15 for the full seven-month period. On the basis of a three-month delay, the additional cost to Alexander-Emst would be $5,520.92 which figure is three-sevenths of $12,882.15.[15]
*863 (g). Home Office Overhead: Alexander-Ernst bas failed to prove any borne office overhead, and, therefore, none will be allowed.[16]
(b). Swmmary of Alexander-Ernst’s Claim: In summary, Alexander-Ernst’s additional expense, based on a three-month delay, is as follows:
Direct Labor-$8,965. 61
Supervision_ 1,261.46
Payroll Insurance_ 250. 56
Payroll Taxes_ 409. 08
National Electrical 'Benefit Bund_ 102. 27
Field Overhead Expense_ 5,520.92
Home Office Overhead_ None
Total_ 16,509.90
41. The Standard Engineering Co.: The Standard Engineering Co. (.Standard) was the plumbing and heating subcontractor for the State Department Building. It submitted its ibid to plaintiff immediately before plaintiff submitted 'its bid to defendant which was just prior to bid opening. Standard’s bid was based on a required performance time of 1,000 days, i.e., to April 13, 1960. After plaintiff was determined to be the low bidder, Standard was orally awarded the subcontract. Standard entered on the jobsite during the week of July 24, 1957, land immediately set up an office on the site. Its first labor payroll covered the week ending August 6, 1957. The formal subcontract itself was not reduced to writing until December 1957. Meanwhile, Standard toad advised plaintiff in writing during the middle of July that the contract drawings in general were hard to read, and some were impossible to read. It advised plaintiff that it needed new drawings. However, Standard proceeded with some of its *864 contract work and did .perform a portion .thereof during first eight months of the contract, during which the new drawings were being prepared land furnished.
(a). Psychological Slowdown: Standard’s claim of damages for a psychological slowdown by its workers attributable to defendant is entirely speculative and is not supported by the evidence.[17]
'(to). Labor: The parties agree that Standard’s average wage increase amounted to 2.3 percent based on an assumed eight-month delay. Its total payroll was $1,045,03.9. Of this, approximately $155,578.56 was for additional labor cost allowed in change orders at the then current labor rates. Applying the 2.3 percent wage increases to the remaining $889,-460.44 reveals increased costs of $20,457.59 for an assumed eight-month delay. On the basis of the three-month delay found herein, this amounts to $7,671.60, being three-eighths of $20,457.59.
(c). Insurance and Taxes: The parties agree that payroll insurance and taxes are reasonably estimated at ten percent of direct labor which is $767.16 for the three-month period of delay.
(d). Overhead: The parties agree that Standard’s overhead may be assumed to be ten percent of the total direct labor 'and insurance and taxes. This amounts to $843.88.
(e). Jobsite Expense: Defendant’s audit of Standard’s job-site expenses for the six-month period from January 1,1960 to July 1,1960, the period claimed by Standard, revealed such expenses to be $10,680.86, which Standard now accepts. Its *865 additional jobsite expenses for a tbree-montli delay period would 'be approximately $5,340.43.
(f). Summary of Standard's Claim: On the basis of a three-month delay, Standard’s additional expenses are as follows:
Psychological slowdown_ 0
Labor increases_$7,671. 60
Insurance and taxes_ 767.16
Subtotal_ 8, 438. 76
Overhead _ 843.88
Jobsite expense_ 5,340. 43
Total_ 14,623. 07
42. Standard assigned all moneys it had due from plaintiff under the subcontract to the Security Bank of Washington, D.C. Subsequently, Standard went bankrupt, and on May 12, 1964, the Security Bank acquired the right to all funds due from plaintiff to the bankrupt estate. In order to settle this claim, which included many matters not involved in this litigation, plaintiff paid Security Bank $75,000. Under the terms of the settlement agreement, plaintiff was granted the right to retain the first $100,000 of the proceeds of the present claim on behalf of Standard, and Security Bank was to receive the next $75,000.
43. Edward W. Minie Co.: The Edward W. Minte Co. (Minte) was the painting subcontractor on the State Department Building. It submitted its bid to plaintiff prior to bid opening. Plaintiff verbally awarded the subcontract to Minte shortly thereafter 'and stated that a formal agreement with Minte would be negotiated later. Minte began work on June 18,1958, but the formal written subcontract was not executed until September 22, 1958, over a year after the award.
Minte claims it was delayed 30 weeks, or approximately seven months, because of the illegible and inadequate drawings. The basis for Minte’s claim is that it incurred certain additional wage and material costs that it would not have incurred had Minte been able to start work 30 weeks sooner than it did.
*866 The parties are in substantial agreement on Minte’s additional costs based on a 30-week delay. These are as follows:
Labor increases_$2, 802.24
Insurance and taxes- 339. 97
Social Security taxes_ 76. SO
Material cost increase (paint)_,_ 73.65
Subtotal _ 3,292.36
Overhead @ 10%_ 329 24
Subtotal —_ 3, 621. 60
Less adjustment for change orders @ 16.7%- (604.81)
Total additional expenses for 30 weeks- 3, 016. 79
On the basis of a three-month delay, Monte’s additional expenses would be $1,292.91, which figure is three-sevenths of $3,016.79.
44. The Printz Floor Co., Inc.: The Printz Floor Co., Inc. (Printz) was the resilient flooring contractor for the State Department Building. Printz submitted its bid in the amount of about $304,000 or $305,000 to plaintiff the day before bid opening. The subcontract was negotiated between the parties and executed in the amount of $280,000 on September 26, 1957, about three months thereafter. The reason for the reduction in contract price, according to Printz, was that during negotiations with plaintiff for the subcontract, reductions in estimates were made where possible, in order to get the job. Later, additions and changes increased this subcontract to $344,971.31.
By September 26, 1957, the date of the execution of the subcontract, plaintiff was aware of the requirement for the substitution of A-drawings with accompanying delays and was also aware of an approximate 90-day delay because of the probable • change in structural steel requirements. Printz’s president testified he was not advised of these problems, and felt there was no reason for plaintiff to so advise him as long as the job was completed in accordance with the time allowed in the specifications, which he erroneously thought to be December 31,1959.
The flooring subcontractor is one of the last trades to work on a construction job. Printz’s claim of eight months delay *867 from December 31, 1959, to August 31, 1960, is based on its allegation that because the original drawings for the job had not been coordinated, much of its work had to be accomplished beyond the anticipated completion date, which unexpected delay caused additional direct and indirect expenses. Printz maintained that it intended to begin work about May 1, 1959, but due to the delay, it could not actually begin sub-: stantial work until October 1959, or five months after the contemplated starting date. like the other subcontractors, Printz is entitled to recover only for the three-month overall contract delay previously found to be attributable to defendant.
(a). Material Cost: Printz’s claim of additional material cost for vinyl and asphalt tile is not substantiated by the evidence and therefore fails for lack of proof.[18]
(b). Labor Increases: The parties agree that on the basis of an eight-month delay following December 31, 1959, Printz had increased labor costs of $1,272.10. This includes a proper *868 allowance for change order labor. For a three-month, delay, as found herein, this labor increase amounts to $477.04.
'(c). Overhead: The parties agree that Printz’s additional overhead would be at the rate of 12.36 percent of direct costs, or $58.96 for a three-month delay period.
(d). Bumma/ry of Prints Claim: Printz’s additional cost for a three-month delay is as follows:
Increased labor_$477.04
Overhead at 12.36%- 58. 96
Total _ 536.00
45. Columbia Mosaic Tile Co., Inc., Roman Mosaic & Tile Co., Inc., and Standard Art, Marble & Tile Co., Inc.: Columbia Mosaic & Tile Co., Inc., Boman Mosaic & Tile Co., Inc., and Standard Art, Marble and Tile Co., Inc. formed a joint venture (hereinafter referred to as OB&S) for the performance of the interior tile, terrazzo, and glass mosaic work on the State Department Building. Each of these three companies submitted separate bids before plaintiff bid on the contract. After the award to plaintiff, no one of these subcontractors individually felt assured of obtaining a subcontract. Accordingly, approximately eight weeks prior to the execution of the subcontract on October 2, 1957, the three companies as a joint venture submitted a price to plaintiff. Plaintiff and the joint venture held negotiations over this bid, which resulted in the agreed-upon work and price shown in the subcontract dated October 2, 1957. CB&S did not have plaintiff’s progress chart at the time it entered into the subcontract and relied on the contract documents, which showed 1,000 days as the time necessary for completion of the job. CB&S was not advised by plaintiff of the delay problems and was unaware of them at the time the subcontract was executed on October 2,1957.
CB&S claims that it anticipated its work to go forward in accordance with plaintiff’s progress chart which was supplied sometime after the subcontract was signed, and which showed job completion by December 31, 1959. On this basis CB&S alleges that it had hoped to commence its work about October 1, 1958, and complete the job by October 30, 1959. It did not actually begin work, however, until January 195.9, *869 and its job was substantially completed only ¡by tbe end of 1960. It here claims damages based on an 11-month delay for increased labor rates, payroll taxes, social security taxes, and overhead expenses. The parties agree that if CE&S had performed its subcontract 11 months later than anticipated, it had additional direct labor (including a timekeeper-bookkeeper) amounting to $5,079.91, additional payroll taxes and insurance amounting to $507.99, and additional social security taxes of $238.27, or total excess costs of $5,826.17.[19]
On the basis of the three-month delay found herein CE&S’s damages for the delay amount to $1,588.96, which figure is three-elevenths of $5,826.17.
46. Carthage Marble Corf.; The Carthage Marble Corp. (■Carthage) subcontracted with the plaintiff on July 1, 1957, to install the interior marble and slate in the State Department Building. Carthage thereafter negotiated with the above joint venture, CE&S, for further subcontracting of a portion of the work. They reached an agreement in October 1957, and on January 7,1958, Carthage entered into a formal written agreement with CE&S to perform certain of Carthage’s work under a sub-subcontract.
CE&S makes it claim herein through Carthage, alleging that it had anticipated starting work on October 15, 1958, and completing the job by November 30, 1959. Actually, it was not able to begin work until ¡about the end of 1960. It claims a delay of 10 months.
The parties agree that had this work been performed 10 months earlier, its direct labor (including the timekeeper-bookkeeper) would have been $4,877.78 less than it was, the payroll taxes and insurance would have ¡been $487.78 less, and social security taxes would have been $268.35 less. The total of these figures is $5,633.91.[20]
*870 Based on the three-month delay found herein, CB&S’s additional expense to perform the Carthage subcontract was $1,690.17 which figure is three-tenths of $5,683.91.
47. The Novinger Co., Inc.: The Novinger-Co., Inc. (Nov-inger) was the lathing land plastering subcontractor on the State Department Building. Novinger submitted its hid to plaintiff for $1,600,000 on June 27, 1957, shortly before the latter’s ibid on the prime contract. Novinger contemplated that contract performance would require the full contract time to April 1960. In early September 1957, Novinger reached a verbal agreement with plaintiff for the subcontract. However, Novinger was unable to obtain a performance bond, ¡and prior to the execution of a formal written subcontract on May -8, 1958, the prior verbal agreement was modified by the parties. The modification did not change the basic price but merely provided for plaintiff to share an agreed percentage of Novinger’s profits, in lieu of furnishing a bond to assure completion of the work. Novinger became aware of the defective drawings problem about September 18,1957, which was shortly after its verbal agreement with plaintiff, but substantially prior to the ¡modified written agreement of May 8,1958.
The commencement of lathing and plastering depended on the prior accomplishment of other major phases of the construction, and Novinger claims a nine-month delay to it in commencing its ¡work due to the defective drawings. It maintains iit could have begun work but for the delay on July 1, 1958, with a full crew of workers, but was not able actually to begin until ¡about April 1,1959, because of the delay. However, Novinger actually had completed ,about 23 percent of its work ¡by April 1,1959.
(a). The parties now agree that if Novinger had performed the work eight months earlier, its wage rates would have been reduced by $27,137.69 prior to adjustment for change orders.[21] On the basis of the three-month delay found *871 herein, ¡this amounts to $10,176.63, which figure -is three-eighths of $27,137.69.
(b). Change order labor amounted to 12.66 percent of total labor.[22] This requires a reduction of $1,288.36.
(c). Social security taxes and insurance attributable to net additional labor cost amounted to $739.61.[23]
(d). On the basis of the three-month delay found herein, Novinger’s additional costs were 'as follows:
Additional labor cost_$10,176. 63
Less: Change order labor_ 1,288.36
Net additional labor cost_ 8,888.27
Social security taxes and insurance_ 739.61
Total_ 9,627.88
48. The Peterson Oo.: The Peterson Company, a partnership, was the subcontractor for the hollow metal work, mill work, and rough carpentry work on the State Department Building. At the time of the bid opening, Peterson negotiated a verbal subcontract with plaintiff agreeing upon the amount of work involved and an approximate sum of money for that work. Peterson’s computations were based on the time' set forth in the specifications, and it expected to take whatever time was shown in the contract documents. Further negotiations during the first few weeks following the 'bid resulted in a written subcontract agreement with plaintiff dated April 18,1958. Peterson was not advised of probable delays because of defective drawings and was unaware of any such delays at the time of the written subcontract executed in April 1958. Its work, like that of the other subcontractors involved various change orders and stop orders.
Peterson’s revised claim herein is based on a setback of wages for an eight-month period, using the prevailing wage rates during such setback period. The parties -agree that if Peterson had performed its contract eight months earlier, it *872 would have bad lower payroll expenses (after adjustment of 35.08 percent for change order labor) amounting to $6,762.38.[24]
•On the basis of the three-month delay found herein, Peterson’s additional labor cost was approximately $2,535.89, which figure is three-eighths of $6,762.38.
ADMINISTRATIVE PROCEEDINGS
49. Plaintiff has received equitable adjustments for its increased costs with respect to physical changes and additional engineering incurred as a result of the A-drawings, addenda fly sheets, and the numerous change orders issued. However, the contracting officer denied plaintiff’s claim in regard to the delay costs under consideration here. Plaintiff appealed the contracting officer’s decision to the GSA Board of Contract Appeals. On April 18,1963, the Board denied the appeal for lack of jurisdiction over claims that “relate only to Government-caused delays, which, as the contracting officer found properly, are not compensable under the contract.”
50. Prior to the Board’s decision, plaintiff had executed a release dated March 14,1963, in accordance with Clause 7 (d) of the contract, whereby the defendant was released:
* * * from any and all claims arising under or by virtue of said contract or any modification or change thereof except as f ollows:
The claim now pending before the Board of Contract Appeals, General Services Administration, arising out of the furnishing by the Government of illegible and inadequate plans and drawings and the substitution of other drawings therefor resulting in additional cost and expense to the contractor in the amount of approximately $2,243,838.
*873 51. Plaintiff filed a timely suit in tins court and by consent of 'both parties, a trial of all factual issues was held without reference to the proceedings before the Board.
Ultimate Findings oe Fact
52. The original contract documents (including the addenda drawings) were suitable for bidding purposes, but were inadequate for construction purposes due to partial illegibility and lack of coordination in the drawings.
53. The defendant’s decision to issue new A-drawings was not made for the convenience of the contractor. The A-drawings were required in order that plaintiff and its subcontractors could satisfactorily perform the contract and construct an acceptable building.
54. The change made in the design of the reinforcing steel in the columns resulted from the infeasibility of the original “bundled bars” design which, under the circumstances of this construction job, could not be executed in the field.
55. Certain construction problems occurred' even after the new A-drawings were completed and issued. However, plaintiff did not satisfactorily prove what period of delay was solely attributable to these problems as distinguished from concurrent delays attributable to change orders for which plaintiff and its subcontractors have been fully compensated.
56. The period of delay caused by defendant’s defective plans, drawings, and specifications was approximately six months at the beginning of the contract period, namely August 1,1957 through January 31,1958. During that six-month period, however, plaintiff and some of its subcontractors were able to accomplish approximately one-half of the construction work which would have been possible even with legible and adequate drawings. Therefore, the net period of delay suffered by plaintiff and its subcontractors solely as a result of defendant’s fault was three months.
57. On the basis of a three-month delay, the damages to plaintiff and its subcontractors are as follows:

*874

CONCLUSION OF I/AW
Upon the foregoing findings of fact and opinion, which are adopted by the court and made a part of the judgment herein, the court concludes as a matter of law that plaintiff is entitled to recover of and from the United States, as described in finding 57, and judgment is, therefore, entered for plaintiff in the amount of one hundred seventeen thousand six hundred dollars and six cents ($117,600.06).

 In fact, plaintiff has released defendant from any and all claims which it might have had under the contract excepting, however, its claim “arising out of the furnishing by the Government of illegible and inadequate plans and drawings and the substitution of other drawings therefor * * In defendant’s view, the language of the exception clause in the release relates only to alleged delay in preparing and substituting new drawings for the original ones. However, the exception clause clearly is sufficiently broad to cover plaintiff’s claim that the inadequacy of the original drawings and plans relating to reinforcing steel for the building’s columns, which defect resulted in a design change, also delayed plaintiff because of its Inability to obtain prompt delivery of newly specified reinforcing steel. So far as plaintiff is concerned, however, that delay ran approximately concurrently with the delay involved in preparing and furnishing the new drawings.

 The methods used in arriving at this amount are described in detail in finding 38 below.

 See findings 39-48 below for the computations of damages to each subcontractor totaling the above amount.

 Otter contractors who submitted bids on. this project also did not raise any question concerning the adequacy of the contract documents or the feasibility of construction based thereon.

 Nearly 700 change orders were issued during the course of the contract, of which 386 resulted from the A-drawings.

 Beyond a mere allegation by defendant, there is no convincing evidence that McShain had not properly completed the foundation and caisson work under its first contract. Defendant’s assertion that the plaintiff’s foundation work was unsatisfactory, thereby causing the columns to be unfit, is not supported by the record.

 The record does disclose that a process of butt welding was considered but rejected as a means to make the design feasible.

 The formalities of requesting the change and issuing approval occurred on February 11,1959, and June 30,1959, respectively.

 Even then, some further details required that the plaintiff and some of its subcontractors continue work until April 1961.

 One of these schedules lias been discussed in finding 32 •where it was found to be unrealistic and therefore unacceptable.

 For example, it does not reflect the fact that progress is relatively slow during the so-called “start-up” period.

 TMs is computed as three-sixths of $21,460.81. Since both the claim and the audit thereof 'were made on the basis of the amount of delay claimed, which in all instances was greater than the three months found herein, and for the most part, the evidence of record is insufficient to set back all additional expenses herein exactly three months, a percentage such as three-sixths of these expenses necessarily must be used. While this is not in all instances the exact dollar cost for each item, it is a very close approximation. Similar computations will be made for other items of damages herein.

 The parties agree that 15.15 percent of this contract apply to change orders paid at current prices. Thus, any expenses such as labor and material would Include an approximate 15.15 percent fuUy paid through changes Irrespective of any delay, unless contrary evidence were presented. Plaintiff has failed to show that this reduction factor for changes should not be applied to the material cost in question.

 Plaintiff’s claim for increased labor costs is based on the unacceptable proposition that all work should have been completed by December 31, 1959. It claims $111,875.75 as estimated wage increases following December 1959, for which it now agrees to a 15.15 percent decrease because of changes which calculates to a total claim of $94,926.57. As previously explained In finding 32, plaintiff's claims are based upon an unrealistic progress chart which is not accepted In these findings. Plaintiff does agree that, based on an actual set-back of labor Increases for an eight-month period, the figure of $79,893.84 Is factually correct.

 Plaintiff originally claimed only two cranes were idle on the site during the delay period. However, defendant’s auditor verified from plaintiff’s records that during the first eight months of the contract, plaintiff actually placed three contractor-owned cranes on the site, namely, a large 60-ton crane which arrived on July 16, 1957, and two smaller 24- and 25-ton cranes which arrived on August 13, 1957. Plaintiff now claims six months idle time for all three cranes reduced by one-half AGC rates for idle time which totals $16,567.63. Defendant contends that during the six-month period claimed, plaintiff used these cranes productively at least half the time. It allowed AGC rates adjusted by one-half for idle status on the two smallest of these cranes for three months, for a total of $3,990.82.

 Plaintiff claimed job overhead of $95,523.04 covering an eight-month period and computed by using the average monthly job overhead of $11,940.38 for the entire 44-month period of the contract. Defendant, however, presents its overhead computations under a method whereby the cost of rubbish removal is excluded during the aUeged delay period on the theory that such expense varies directly with the work performed. On this record, it has been concluded thait neither party has used the most acceptable method, of computation.

 Alexander-Ernst’s records on this project were thoroughly audited by defendant, and the parties have presented various theories as to the proper method of computing Alexander-Ernst’s additional labor costs incurred as a result of the delay in furnishing corrected drawings. Some fault can be found with each of the submitted alternatives. However, the most nearly accurate method of determining excess labor costs has been found to be a comparison between the actual labor costs and defendant’s projection setting back labor costs for an eight-month period to which is applied a computation reducing the eight-month period to the actual delay period of three months. To this result there must be applied a reduction of 33.785 percent since Alexander-Ernst concedes that change orders for which it was admittedly, paid amounted to 33.785 percent of the additional labor cost involved.
The actual labor and average cost per hour as shown by the certified payroll analysis is as follows:

 Defendant not only would reduce this overhead by 33.785 percent for changes, but would also reduce it further by $8,629.40 comprising salaries paid to a junior and senior engineer during this seven-month period. It based this reduction on the fact that Alexander-Ernst received a change order price increase of $69,759 for additional engineering costs caused by the A-drawings and added fly sheets. Defendant’s auditor made no such deduction, and defendant- made no showing that such electrical engineers were in fact working exclusively on changes, rather than being required on the job for general work throughout the contract regardless of changes. Probably one, if not both, were required on a continuing basis, and lacking evidence to the contrary, this expense should be aUowed subject, of course, to the 33.785 percent reduction for changes made for all overhead.

 Alexander-Ernst claimed ten percent of all costs except payroll taxes as home office overhead. This included the one percent of payroll expense allowed herein for the contribution to the National Electrical Benefit Fund. Alexander-Ernst could furnish no support from any books or records for this claim, and in fact its accountant indicated to defendant’s auditor that this ten percent claim would duplicate those items allowed under field overhead expense. Defendant’s disallowance of such overhead was proper under these circumstances. Alexander-Ernst was a joint venture created specifically for this contract. It set up offices at the site almost immediately, and there is no evidence that either of the home offices of Harry Alexander, Inc. or of E. C. Ernst, Inc. had any additional expense arising out of the joint-venture agreement.

 Standard claims that It Incurred a psychological slowdown and loss of efficiency on the part of its workmen for the entire contract period because of the illegible and inadequate drawings. Standard’s president felt that, because of the many changes and work interruptions, it was his impression the men got the idea that this contract was a cost-plus-a-fixed-fee contract and that loss of efficiency caused by this notion continued throughout .the entire contract. He estimated this loss in efficiency at 7% percent of Standard’s entire direct labor on the job of $1,045,039 which amounts to $78,477. There is no credible evidence that defendant was in any way responsible for the employees’ mistaken: impression that this was a cost-plus contract. Standard received payment for all changes as well as payment for A-drawing changes, Including applicable overhead which would include payment for any time required to construct such changes. Standard’s estimate of 7% percent of direct lajbor for a psychological slowdown has no basis in the record. ’Standard also submitted a claim under the assumption that it could have completed the job by December 81, 1959, but for an eight-month delay caused by the illegible and inadequate drawings. It now accepts defendant’s audit figures relating to this portion of its claim.

 Printz claims that subsequent to December 31, 19S9, it tras required to pay 340 per square foot for vinyl tile which had been only 250 per square foot prior thereto, or an increase of 90 per square foot. Prior to submitting its bid, on March 15, 1957, Printz obtained a written commitment from its supplier to supply vinyl tile on this job at 250 per square foot for orders made through December 31, 1959. Printz’s purchase order for the entire job dated March 31, 1958, hears the acceptance of its supplier, and shows vinyl tile at 250 per square foot. However, a statement thereon reading “Price protected to December 31, 1959” was marked out. Whether Printz’s price was 250 only up until December 31, 1959, or whether it continued at 250 thereafter for all contract orders cannot be ascertained from any evidence other than, from its president’s rather vague and unsupported testimony. Printz had apparently destroyed all of its accounting records on this job other than a job cost ledger which was the only record available for audit by defendant. This job cost ledger showed purchases of 340 and 250 per square foot for vinyl tile both before and after December 31, 1959. Printz’s claim that it received a credit of 90 on the 340 tile before December 31, 1959, but not thereafter, cannot be substantiated from any records available for audit or in evidence.
■Printz also claims it incurred an additional cost of 1%0 Per square foot for all asphalt tile purchased after December 31, 1959, alleging it had a protected price of 90 through that date only, and that it was required to pay 10% 0 thereafter. The testimony of a representative of the supplier tended to corroborate this allegation. However, the supplier’s records have also been destroyed. Printz’s job cost ledger, the only record available for audit, reveals its average cost for asphalt tile after December 31, 1959, was 10.040 per square foot, whereas its cost prior thereto averaged 10.760 per square foot. Thus, the only accounting record available shows a smaller average cost after December 31, 1959, than before that date. TJnder these circumstances, it can only, be concluded that Printz has failed to prove that it suffered any loss from increased material costs by reason of the delay.

 Columbia, Roman, and Standard claims an additional 10 percent of labor ($507.99) as a reasonable estimate for additional supervisory, and administrative overhead expense. It presented no books or records or any other evidence to support this additional overhead claim. The timekeeper-bookkeeper’s salary, to the extent of $1,299.41, is included in the additional labor allowed. The allowance of further administrative expense would duplicate this one expense already allowed.

 CE&S also claims an additional 10 percent of direct labor for supervision and administration. CR&S could furnish no supporting records for this claim, and it would in large part duplicate the timekeeper-bookkeeper salary already allowed under direct labor. See footnote 19, supra.

 Novinger’s computation, for alleged delays of 9 months, was based on average monthly wage increases had the work been performed 9 months earlier. This amounted to $35,678.01 prior to adjustment for changes. Defendant’s computation was not based on average wage increases, but it repriced labor' costs for all crafts separately on the basis that the work would have been performed eight months earlier. This amounted to a price increase of $27,137.69, which is not disputed by plaintiff.

 Change order labor, which -was charged at current rates, amounted to $112,204.99 of total repriced contract labor of $886,010.18. ($896,186.81 — $10,176.63=$886,010.18). This amounts to 12.66 percent.

 Social security taxes and insurance on the additional labor expense were computed by defendant to be $1,959.49 on the basis of net additional labor of $23,548.06. Based on net additional labor of $8,888.27 as found herein, this expense would be $739.61.

 This total comprised the following items:
Net labor cost_$5, 981. 28
Social security taxes, etc_ 496.45
Welfare fund contribution_ 284. 65
Total 6, 762. 38